UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF MISSISSIPPI
JACKSON DIVISION

ELIZA ANDERSON, BY AND THROUGH
HER DAUGHTER AND NEXT FRIEND,
MONICA CAIN                                         PLAINTIFF


VS.                          CIVIL ACTION NO. 3:06CV473TSL-JCS


TIM PERKINS, INDIVIDUALLY AND IN
HIS OFFICIAL CAPACITY AS SHERIFF
OF AMITE COUNTY, MISSISSIPPI,
THE COUNTY OF AMITE, MISSISSIPPI,
BY AND THROUGH ITS BOARD OF SUPERVISORS,
ET AL.
                                                   DEFENDANTS


MEMORANDUM OPINION AND ORDER

     This cause is before the court on the motion of defendant Tim

Perkins, Sheriff of Amite County, Mississippi, for summary

judgment as to the individual capacity claims brought against him

in this cause by plaintiff Eliza Anderson, by and through her

daughter and next friend, Monica Cain.  Plaintiff has responded to

the motion and the court, having considered the memoranda of

authorities, together with attachments, submitted by the parties,

concludes that Sheriff Perkins' motion should be granted.

     On November 7, 2005, Eliza Anderson was taken into custody by

the Amite County Sheriff's Department in connection with

involuntary commitment proceedings initiated by her family and was

thereafter held in the Amite County Jail for two weeks while

awaiting transfer to an appropriate facility for mental health

evaluation, diagnosis and treatment.  On the date of her departure

from the jail on November 21, 2005, it was discovered that Ms.

Anderson was suffering from second degree burns on her ankles, thighs and buttocks.  Although she is not sure how these injuries occurred, she believes they were most likely caused by defendants' inappropriate use of restraints on her.  She claims, alternatively, that they were self-inflicted.  But she maintains that regardless of how the injuries occurred, they were the result of defendants' violation of her constitutional rights, and she therefore brought the present action pursuant to 42 U.S.C. § 1983 seeking to recover damages for her injuries.  Sheriff Perkins asserts he is entitled to summary judgment on the basis of qualified immunity with respect to plaintiff's claims against him in his individual capacity.

"'Qualified' or 'good faith' immunity shields government officials performing discretionary functions from liability 'unless their conduct violates clearly established statutory or constitutional rights of which a reasonable person would have known.'"  Babb v. Dorman, 33 F.3d 472, 477 (5th Cir. 1994) (quoting Jacquez v. Procunier, 801 F.2d 789, 791 (5th Cir. 1986)).  "'When a defendant invokes qualified immunity, the burden is on the plaintiff to demonstrate the inapplicability of the defense.'"  Atteberry v. Nocona Gen. Hosp., 430 F.3d 245, 253 (5th Cir. 2005) (quoting McClendon v. City of Columbia, 305 F.3d 314, 323 (5th Cir. 2002) (en banc) (per curiam)).  In determining if qualified immunity applies, the court must decide: (1) whether the plaintiff has alleged a violation of a clearly established constitutional

2

right; and, (2) if so, whether the defendant's conduct was objectively unreasonable in the light of the clearly established law at the time of the incident.   Id.

Plaintiff has a long history of mental illness.  She has been diagnosed with and suffers from schizoaffective disorder, bipolar type, for which she has been prescribed various anti-psychotic medications.  Over the years, Ms. Anderson has been committed for treatment numerous times; indeed, one witness, jailer Betty Moore, testified that during her fourteen years with the Amite County Sheriff's Department, Ms. Anderson had been held in jail as a lunacy case at least ten times.

On November 8, 2005, Ms. Anderson's daughter, Monica Cain, filed with the Amite County Chancery Clerk an application for commitment of her mother, representing that her mother was mentally ill and posed a substantial likelihood of danger to herself and/or others.  Ms. Cain reported that, among other things, her mother had stopped taking the medications prescribed by her psychiatrist; had been wandering the roads; had taken a lot of furniture and clothes out of her house; had broken the glass on the end tables in the house; and had reportedly been using drugs, though Ms. Cain stated she was not sure whether her mother was actually using drugs (crack cocaine and marijuana) or whether that was part of her delusions.  Ms. Anderson was taken into custody and held in the Amite County Jail awaiting a commitment hearing. That hearing was held on November 16, 2005, and an Order of

3

Commitment was entered that date by a special master, who ordered that Ms. Anderson be committed to River Region Behavioral Health Services (River Region) "for evaluation, diagnosis and treatment, to include medication per physician's order." At that time, however, no beds were available at River Region or at the Mississippi State Hospital, and therefore, the Amite County Sheriff's Department was ordered to hold Ms. Anderson until a bed became available.

Following the hearing, Ms. Anderson was returned to the Amite County Jail where she remained until November 21, when the Sheriff's Department was notified that a bed had become available at River Region. As the deputies were preparing to transport Ms. Anderson to River Region, they noticed what appeared to be severe burns on her inner thighs and around her ankles. Upon admission to River Region, her injuries were documented, and described as second degree burns and possibly chemical burns.

In this action, plaintiff alleges that defendants, including Amite County Sheriff Tim Perkins, either caused the burns/injuries to her ankles, thighs and buttocks by subjecting her to prolonged physical restraint and/or by failing to protect her from self-inflicted harm, and that they then failed to provide reasonable and necessary medical care for her obviously severe injuries.

There is no dispute that Ms. Anderson had serious burns on her ankles, thighs and buttocks when she left the Amite County Jail on November 21, 2005, which presumably were not present when

4

she was taken into custody two weeks earlier, on November 8.[1]  As plaintiff notes, defendants have offered no explanation as to how these injuries did or could have occurred.  And Ms. Anderson, owing to her mental illness, is unable to shed any light on the subject.  Plaintiff, however, has posited alternative theories for how she was injured.

One theory, her primary theory, is that restraints were used on her while she was incarcerated, and that the prolonged use of such restraints caused the injuries.  In support of this theory, plaintiff has presented the report of her medical expert, Dr. Thomas West, who has opined as follows:  that the injuries to Ms. Anderson's ankles are "consistent with use of restraints in the absence of any other documented medical explanation;" that "the onset of injuries to [her] ankles was probably not instantaneous and that the injuries probably manifested over several days;" that "the burn injuries to [her] thighs and buttocks are consistent

---

[1]     For present purposes, it is assumed that Ms. Anderson's injuries occurred while she was being held in the Amite County Jail.  No evidence has been presented that Ms. Anderson had any such injury upon being taken into custody, though it seems reasonably clear that in light of her mental condition, she would not have been in a position to accurately relate medical complaints to intake personnel at the time she was booked, and since it also seems that she refused to change from her "street clothes" into the prison jumpsuit, jail personnel would not have been in a position at the time of booking to observe any physical injuries hidden by her clothing.  However, the evidence indicates that while in the Amite County Jail, Ms. Anderson refused to wear clothes and was naked all or nearly all the time, and yet no one noticed the injuries on her legs until she was transported to River Region on November 21.  Logic would thus suggest that the injuries were sustained at some time during her incarceration.

with 'sheet burns' or induced by abrasion consistent with the use
of restraints;" that "the presence of urine and feces may have
been a contributing factor to the burns on [her] thighs and
buttocks;" and that, as with the injuries to her ankles, the onset
of the injuries to her thighs and buttocks was probably not
instantaneous but rather "manifested over an appreciable amount of
time during her incarceration."

The evidence shows that while she was being held in the Amite
County Jail, Ms. Anderson persisted in her refusal to take the
medications prescribed by her psychiatrist and in the kinds of
violent psychotic behavior that led her daughter to have her
committed.  On the day she was taken into custody and booked into
the Amite County Jail, a pre-screening evaluation form was
completed by Southwest Mississippi Regional Mental Health Complex
which indicated that Ms. Anderson had presented with manic-like
behavior and could not care for herself, that she exhibited a high
risk of provoking harm to herself from others and also that she
was threatening to harm others.  Because of her violent nature,
and the potential for harming others or herself, Ms. Anderson was
assigned to a cell by herself, where she was kept the entire two-
week period.  According to the deposition testimony of jailer
Becky Moore, during her November 2005 stint in the Amite County
Jail, Ms. Anderson remained violent and aggressive.  Ms. Moore and
the other jailers were concerned that Ms. Anderson might hurt
herself, and although there was nothing in the cell she could use

to hurt herself, she would beat the cell door with her hands and would lie on the floor and kick the cell door.  Moore and the other jailers checked on Ms. Anderson regularly throughout their shifts, but Moore testified she was afraid of Ms. Anderson and so would not go into the cell with her but would check on her by looking through the viewing window in the cell door.  Ms. Anderson refused to wear any clothes, and refused to take her medicine.  Because of Ms. Anderson's violent behavior, she was not allowed out of her cell except on occasions when she was transferred to another cell to allow jail staff to clean her cell after she had flooded it by clogging the sink or toilet with towels.

Ms. Moore testified Sheriff Perkins was aware of Ms. Anderson's violent behavior and instructed her to be careful around Ms. Anderson and not to get hurt or let Ms. Anderson get hurt.  Sheriff Perkins was also aware that Ms. Anderson was not taking her medications.  Moore discussed this with him specifically; but he did not know what to do about her not taking her medication and told Moore to just do the best she could to get Ms. Anderson to take her medication.

Plaintiff argues that if restraints were used on her as punishment for her psychotic behavior, then defendants violated her clearly established constitutional right to be protected from harm by means of cruel and unusual punishment.  See Partridge v. Two Unknown Police Officers of City of Houston, Tex., 791 F.2d 1182, 1186 (5th Cir. 1986) (recognizing that "[a] pre-trial

detainee . . . has a Fourteenth Amendment Due Process right to be free from punishment altogether") (citing Bell v. Wolfish, 441 U.S. 520, 99 S. Ct. 1861, 60 L. Ed. 2d 447 (1979)). She submits that if restraints were used for behavioral purposes, that is, to subdue Ms. Anderson in her cell due to her psychotic behavior, then her injuries were inflicted by Sheriff Perkins and/or his jailers, in which event Ms. Anderson's constitutional right to reasonable medical care to ensure the proper use of restraints for behavioral purposes was clearly violated.[2] See Youngberg v. Romeo, 457 U.S. 307, 320-22, 102 S. Ct. 2452, 2460-61, 73 L. Ed. 2d 28 (1982) (holding that state may not restrain residents of state hospital except when and to the extent professional judgment deems this necessary to assure reasonable safety for resident and others).

Plaintiff submits that regardless of how she received the injuries at issue, it is clear that these injuries did not simply appear for the first time on November 21, but rather manifested themselves over an appreciable period of time. She concludes that given the severity of her injuries, it would have been apparent to defendants that she needed immediate medical care for her injuries for several days while in the Amite County Jail but she was denied

---

[2]    Dr. Larry Small, one of plaintiff's experts, has opined that restraints should never be used for behavioral purposes unless directed by medical staff, and then should only be used on inmates/detainees to prevent physical harm to self or others and only after other interventions have failed, as a last resort and for the shortest amount of time needed for the person to regain control.

needed medical care in violation of her clearly established right to such care.

In his motion for summary judgment, Sheriff Perkins contends he is entitled to qualified immunity with respect to plaintiff's charge regarding the alleged use of restraints in light of his own sworn testimony, by affidavit and in his deposition, that restraints were not used on Ms. Anderson at any time and/or that he was unaware of any alleged use of restraints, and in light of plaintiff's lack of evidence to the contrary. Indeed, the only proof plaintiff has offered regarding the alleged use of restraints is the opinion of Dr. West, a medical expert, who does not state that restraints were likely used but rather opines only that the injuries to Ms. Anderson's ankles were "consistent with" the use of restraints. Thus, in the face of Sheriff Perkins' testimony that restraints were not used on Ms. Anderson, plaintiff has come forward with no affirmative proof tending to show that restraints were likely used on Ms. Anderson at any time during her incarceration in the Amite County Jail.[3]  However, even if the

---

[3]   Plaintiff's position is that restraints were used on Ms. Anderson over a prolonged period of time.  Yet the proof shows that Ms. Anderson's daughter, Monica Cain, visited her mother at the jail regularly while she was there during November 2005, and Ms. Cain has not suggested that she ever saw her mother in restraints.  Of course she did testify that she was not always allowed to see her mother and when she was, she was not allowed to go into the cell with her mother; but she did see her often and was able to look into the cell through the viewing window, which allowed at least partial visual access of her mother.  The record also reflects that a mental health officer, Ms. Katina Bell, also went to see Ms. Anderson while she was at the jail; and yet there is no proof from her, either, that she ever saw Ms. Anderson in

court were to assume for the sake of argument that restraints were used on Ms. Anderson, as plaintiff contends, she still could not overcome Sheriff Perkins' qualified immunity, for there is no proof of any sort tending to show that Sheriff Perkins was aware of any use of restraints on Ms. Anderson.

Plaintiff's further charge that Sheriff Perkins and his deputies failed to provide necessary medical care to Ms. Anderson has two components.  First, she charges that in failing to take steps to ensure that Ms. Anderson took her medications, Sheriff Perkins was deliberately indifferent to her medical needs.[4] Second, she maintains that Sheriff Perkins violated her constitutional rights by failing to provide medical care for the injuries to her ankles, thighs and buttocks.  Plaintiff can sustain neither claim.

As plaintiff correctly notes, persons detained awaiting civil commitment due to mental illness have a clearly established constitutional right to reasonable medical care, including mental

restraints.

[4]     Plaintiff has argued that if Ms. Anderson's injuries were self-inflicted and not the result of the use of restraints, the risk of self-inflicted injury was obvious because of Ms. Anderson's prior history and her psychotic behavior and lack of prescribed medication during the subject incarceration.  Plaintiff argues that Sheriff Perkins' conduct was objectively unreasonable because he had actual knowledge of a substantial risk that she might hurt herself while in the Amite County Jail but failed to take any steps to abate the risk.  However, in essence, the only "steps" plaintiff has suggested Sheriff Perkins could have taken to abate the risk was to have Ms. Anderson transferred to an appropriate mental health facility so that she could receive appropriate mental health treatment.

health care, <u>Boston v. Lafayette County, Miss.</u>, 743 F. Supp. 462, 473-74 (N.D. Miss. 1990), which includes a right to be protected from self-harm (or harm inflicted by others), <u>see Partridge v. Two Unknown Police Officers of City of Houston, Tex.</u>, 791 F.2d 1182, 1187 n.20 (5th Cir. 1986) (stating that "liability under § 1983 'may be predicated upon inadequate custodial care of an inmate who might harm himself,'" which is "'an aspect of the broader constitutional duty to provide medical care for inmates') (citations omitted).  <u>See also</u> <u>Jacobs v. West Feliciana Sheriff's Dep't</u>, 228 F.3d 388, 393 (5th Cir. 2000) (holding that non-prisoner detainees look to the Fourteenth Amendment's guarantees of procedural and substantive due process rights with regard to "constitutional essentials" such as safety and medical care).  The failure to provide such care arises to the level of a constitutional violation only when it is a product of deliberate indifference.  <u>Hare v. City of Corinth, Mississippi, (Hare II)</u>, 74 F.3d 633, 643 (5th Cir. 1996)( en banc); <u>Boston v. Lafayette County, Miss.</u>, 743 F. Supp. at 753 (holding that "the degree of medical care constitutionally mandated for mentally ill detainees awaiting commitment proceedings is clear only to the extent that pretrial detainees may not be treated with deliberate indifference to their serious medical needs.").

Plaintiff argues that Sheriff Perkins' conduct in not providing medical care to ensure she was taking her medication was

11

objectively unreasonable and amounted to deliberate indifference.
Her position cannot be sustained.  It is true that Sheriff Perkins
was aware that plaintiff had been prescribed anti-psychotic
medications and that she was not taking those medications while in
jail.  He was likely also aware that her psychotic and violent
behavior was a result of her not taking her medication.  The fact
is, however, that even prior to being taken into custody, Ms.
Anderson was not taking the medications that had been prescribed
for her.  That was a significant factor in her condition and in
her daughter's decision to have her committed in the first place,
as reflected in the writ executed by Monica Cain to have her
mother taken into custody.[5]  The fact that Ms. Anderson was not
taking her medications was addressed at the commitment hearing,
and the special master explicitly directed that Ms. Anderson's
evaluation, diagnosis and treatment at River Region include
medication per physician's order.  Everyone involved in the
commitment process, including the family, the Chancery Clerk's
office personnel, Sheriff's Department personnel, and the special
master, knew that Ms. Anderson was not taking her prescribed

---

[5]      Plaintiff argues that "[i]t is self-evident from the
record in this case that [Ms. Anderson's] psychotic behavior while
incarcerated in the Amite County Jail is related to the fact that
she suffers from mental illness and also from the fact that she
would not take her prescribed medication."  Likewise, Ms.
Anderson's psychotic behavior before she was ever taken into
custody was related to her mental illness and the fact that she
would not take her medication.  That is why her daughter sought to
have her committed, and why the special master ordered that she be
committed to River Region once a bed became available at that
facility.

medications, that she needed to be taking her medications and that she needed to be committed to an appropriate mental health care facility where that could occur.  It is undisputed that there was no bed available at such a facility during the time Ms. Anderson was in the Amite County Jail; and in fact, the only reason she was being held in the jail was because there was no room for her at a mental health care facility where she could receive such treatment.  If the special master had considered that the need for medication was of such an emergency nature that it could not have awaited the opening of a place for Ms. Anderson at River Region or another such facility, he could have made some other provision for her; but he did not do so.  Under the circumstances, Sheriff Perkins could hardly be reasonably found to have been deliberately indifferent to Ms. Anderson's need for medication,[6] any more than plaintiff's own family could be said to have been deliberately indifferent to that same need.

With respect to the injuries on plaintiffs ankles, thighs and buttocks, plaintiff has alleged that Sheriff Perkins had actual

---

[6]   Plaintiff likens her mother's circumstance in which she was not taking her medications to that of a detained prisoner who runs out of his prescription medication while incarcerated and needs a refill.  She submits that in such a circumstance, the sheriff's refusal to take the inmate to the doctor (or to contact the doctor) to get the needed refill would constitute deliberate indifference, and in her view, it was likewise deliberately indifferent for Sheriff Perkins and his staff to fail to take Ms. Anderson to the doctor when she refused to take her medicine. Clearly, however, Ms. Anderson's situation was very different from that of an inmate who voluntarily takes his medicine and simply needs access to his medicine.

knowledge of Ms. Anderson's acute need for emergency medical care, and deliberately ignored this need for several days.  However, Sheriff Perkins maintains that he had no knowledge of her injuries.  Sheriff Perkins testified that he did not personally observe Ms. Anderson at all during her incarceration in November 2005 and the only information he had about Ms. Anderson was what he was told by jail personnel, whose job it was to monitor and observe detainees.  To his knowledge, his jailers never noticed Ms. Anderson's injuries until the day she was discharged and transported to River Region.  Sheriff Perkins insists that had Ms. Anderson complained or had her injuries been noticed prior to the time of her departure, medical care would have been sought on her behalf consistent with the policies of the Amite County Sheriff's Department.  He maintains the only reason medical care was not provided earlier is because neither he, nor his employees were aware that she was in need of medical attention.  The question, then, is whether Sheriff Perkins was deliberately indifferent in failing to become aware of Ms. Anderson's injuries prior to the date of her departure from the facility.

In this vein, plaintiff charges that Sheriff Perkins does not provide "minimal, reasonable and necessary" supervision for psychiatric patients housed at the county jail, and that had such supervision been provided, Ms. Anderson's injuries would have been discovered.  The evidence, however, shows that jailers inspected the jail regularly throughout the day and night, which included

visually observing Ms. Anderson through the viewing window on her cell door.  Thus, contrary to plaintiff's allegation, monitoring and supervision was provided.  Presumably, had the jailers noticed Ms. Anderson's injuries, this would have been reported and appropriate steps taken to provide her with medical care.  In the court's opinion, the fact that Sheriff Perkins did not require that his employees actually enter the cell and visually inspect Ms. Anderson's naked body for signs of injury does not amount to deliberate indifference.[7]

For these reasons, it is ordered that Sheriff Perkins' motion for summary judgment is granted.

SO ORDERED this 20th day of November, 2007.


/s/ Tom S. Lee
UNITED STATES DISTRICT JUDGE

---

[7]     Monica Cain asserts in her affidavit that a few days before November 21, her mother told her that her legs were hurting.  Ms. Cain asked to see her mother, but Becky Moore would not allow Ms. Cain to enter the cell.  According to Ms. Cain, Ms. Moore said she would check on Ms. Anderson herself.  Ms. Moore testified that she had no recollection of any such conversation and was never made aware that Ms. Anderson claimed her legs were hurting.  Accepting Ms. Cain's testimony as true shows only that Ms. Moore knew that Ms. Anderson was complaining about her legs. There is no proof that Sheriff Perkins had any such information.